NATIONWIDE HORSE CARRIERS, INC.,
Appellant,

v.

Randolph P. JOHNSTON, Appellee.

No. 16372.

Court of Civil Appeals of Texas,
Houston (1st Dist.).

Dec. 27, 1974.

Rehearing Denied Feb. 13, 1975.

Roger R. Wright, Jr., Bruce S. Powers, Houston, Woodard, Hall, McCrory, Henry & Primm, Houston, of counsel, for appellant.

Franklin R. Navarro, Houston, for appellee.

EVANS, Justice.

Nationwide Horse Carriers, Inc., appeals from a judgment awarding Randolph P. Johnston damages in the aggregate amount of $32,774.00. Johnston, accompanied by a horse trainer named Bill Mook, attended a horse auction in Ocala, Florida in October, 1970 and while there purchased a mare named "Meadow" for a price of $9,100.00. In purchasing Meadow, Johnston received the advice and counsel of Mook, an experienced horse trainer and farm manager of Windswept Downs, a farm near Huntsville, Texas to which Meadow was to be transported. Mook acted as agent for Johnston in this purchase, and acting on behalf of Johnston, Mook made arrangements with Norman Casse, the local agent for Nationwide, to transport Meadow and its weanling back to Texas. Pursuant to

these arrangements, Casse caused Meadow and its weanling to be picked up at the auction site and taken to Stovala Farm, a nearby horse farm, where they were to be temporarily boarded until Casse had a full load of horses to transport to Texas. Several days later, Meadow and its weanling were loaded on a Nationwide van and transported with other horses to Texas. Pursuant to Nationwide's instructions, the driver of the van submitted a bill of lading to Frank Farro, the person in charge of Stovala Farm, who signed the document as shipper. The bill of lading indicated a sum of $200.00 as the declared value of Meadow for the purposes of shipment.

Meadow was in foal at the time of her purchase at the auction in Ocala, Florida. During the trip from Florida to Texas she received a leg laceration which was discovered by Mook upon her delivery at Windswept Downs. After her arrival at Windswept Downs, she was again examined and found to be in foal, but in December, 1970 she began to lose weight. In March she was examined and found to be no longer pregnant. Subsequently in the year 1972, Meadow was again found to be in foal, but that foal died 22 days after birth. Meadow ultimately gave birth to another foal and that delivery was normal and the colt was living at the time of trial.

The jury found that Meadow's injury was the result of Nationwide's negligence and awarded $10,000.00 for the loss of the foal which was never born; $22,500.00 for Meadow's diminished ability to produce sound and healthy foals and $274.00 as the cost of veterinary services. The jury also found that Casse had acted as agent for Nationwide when he signed the bill of lading as an agent for the carrier.

In response to special issues one through three, the jury failed to find (1) that Johnston had expressly or impliedly authorized Nationwide to transport Meadow from Florida to Texas "in accordance with the bill of lading"; (2) that Mook had acted as agent for Johnston in arranging for the transportation of Meadow by Nationwide "in accordance with the bill of lading" and (3) that Farro had acted as agent for Johnston when he signed the bill of lading as shipper. In its first six points of error, Nationwide asserts the trial court erred in refusing to disregard the jury's negative answers to these issues and in refusing to grant its motion for judgment non obstante veredicto, charging that the evidence conclusively established the affirmative of such issues and that the jury's answers were against the great weight and preponderance of the evidence. These points of error, and Nationwide's related assignments in its amended motion for new trial in the trial court, question only the legal sufficiency of the evidence. Chemical Cleaning, Inc. v. Chemical Cleaning & Equipment Service, Inc., 462 S.W.2d 276 (Tex.1970). Under such circumstances no purpose would be gained by permitting Nationwide to file an amended brief restating these points of error and such motion is overruled. We are further of the opinion, based upon a review of the record before us, that had the question of the factual sufficiency of the evidence on these points been preserved in the trial court and presented to us for review, we would be compelled to overrule such points. Chemical Cleaning, Inc. v. Chemical Cleaning & Equipment Service, Inc., 456 S.W.2d 724, 728 (Tex.Civ.App.—Beaumont 1970, writ ref'd n. r. e., 462 S.W.2d 276, Tex.)

Johnston testified that Mook acted as his agent in purchasing Meadow and that Mook made all the arrangements with Nationwide to ship the horses back to Texas. He knew Meadow had been taken back to Stovala Farm, and he knew that neither he nor Mook would be in Florida when the horses were to be picked up by Nationwide and taken back to Texas. He realized the manager of Stovala Farm was going to deliver the horses to Nationwide's driver. He further testified that he had never met Farro, the manager of Stovala Farm nor had he authorized Mook to give instructions or authorizations to Farro.

Mook testified he had known Nationwide's agent, Casse, prior to that occasion and that in his discussion with Casse, he was told that Casse had a partial load of horses which were going to be transported to Texas and that Mook's horses would fill out the load. He testified that when a horse was purchased at the auction site it had to be moved immediately from the sales ring because there were other horses coming in that were selling on that particular day and that he just hired Casse to move the horses. He said he had no discussion with Casse or Johnston about declared value to be filled in in the bill of lading, although he said he was familiar with a bill of lading provision stating a declared value in case of death.

Casse testified that he was requested by Mook to transport the horses to Texas; that Mook asked him to transport the horses back to Stovala Farm, where they had been located prior to the auction, so that they could be boarded there while Johnston and Mook completed their purchases at the auction. Casse said that Mook preferred the horses to be at Stovala Farm where they would be attended, rather than being left unattended at the auction sales pavilion. Casse testified he was employed to ship the horses from the sales pavilion back to Stovala Farm until the time he had a full load coming down to the Houston area and that he took the horses to Stovala Farm and delivered them to its manager, Frank Farro. Subsequently Casse sent his driver to Stovala Farm with a bill of lading and the horses were loaded on the van for transportation back to Texas. The driver was instructed to have Farro sign the bill of lading as shipper. Casse testified he was required to have a bill of lading under ICC regulations and said he had to have someone sign the bill when they were picked up and also when they were delivered.

Casse testified that all of the handwritten data on the face of the bill of lading was in his own handwriting except for the pricing information and that his wife signed his name to the bill of lading. The testimony does not establish who inked in the declared value of $200.00. It is undisputed that neither Mook nor Johnston was present at the time the bill of lading was submitted to Farro and signed by him, both having returned to Texas prior to the time the horses were picked up by Nationwide at Stovala Farm.

■ The liability of a carrier may be limited to an agreed or declared value by appropriate designation in the bill of lading. 49 U.S.C.A., § 20(11). However, the carrier's customer must be given a fair opportunity to choose between higher or lower liability by paying a correspondingly greater or lesser charge. New York, N. H. & Hartford R. Co. v. Nothnagle, 346 U.S. 128, 135, 73 S.Ct. 986, 990, 97 L.Ed. 1340 (1953).

■■ Johnston and Mook both denied having any discussion concerning the declared value and their testimony in this respect is uncontroverted. There is little or no evidence from which an implied authorization on their part to Farro could be inferred and the jury could reasonably have concluded that Mook, as agent for Johnston, had not arranged transportation "in accordance with the bill of lading" and that Farro had acted entirely without authority of either Johnston or Mook in signing the bill of lading as shipper. Appellant's first six points of error are overruled.

In its seventh point of error Nationwide contends the trial court erred in admitting Mook's deposition testimony as to the cause and manner in which Meadow had failed to produce a foal in 1971. It asserts that there was conflicting and "evenly balanced" expert testimony as to the loss of the unborn foal presented through two veterinarians, Dr. Kelly and Dr. Cooley, and that the improper admission of Mook's testimony on the same point "tipped the balance" and constituted reversible error. While this question is perhaps moot in view of our holding with respect to Na-

tionwide's eighth point, we shall consider it since it may have some bearing on Nationwide's points eleven, twelve and thirteen.

Dr. Kelly, called as a witness by Johnston, testified that he had examined Meadow just after she had been unloaded from the van at Windswept Downs and that the animal was in a state of shock. He said the injury to her leg was pretty severe and probably was the cause of her condition of shock. He said he gave her tranquilizers to calm her down and antibiotics to keep down infection and thereafter examined her once every week or two. He said within two or three weeks after her arrival, he palpated Meadow to determine if she was pregnant and found that she was in foal. He subsequently examined her in the latter part of December or early January and found that she was "open", meaning that no fetus was present. He testified that she had either lost her foal or something had happened to it and explained the process of absorption as meaning that the fetus of the foal is just dissolved and absorbed within the body. He testified that a disease, injury or shock, "any number of things" can cause the death of the fetus. In response to hypothetical question he testified that an injury of the nature sustained by Meadow during transit would in reasonable medical probability have been a producing cause of the absorption or loss of her foal and that in his opinion she had lost her foal as a proximate result of the injury sustained in the van. He also testified that this would have shortened her life expectancy. He further testified that a mare may carry a fetus three or four months before it is absorbed and that it takes a longer period of time for the fetus to be absorbed than to be aborted. He said that in his opinion absorption will not occur in the latter stages of pregnancy. He said it was possible that Meadow had sloughed her foal through an abortive process rather than having lost it through the absorption process.

Dr. B. M. Cooley testified that he examined Meadow several days after her arrival at Windswept Downs. He did not palpate Meadow to determine if she was in foal but was informed that she was in foal. He testified that barring complications he did not believe that the injury which Meadow sustained would shorten her life expectancy nor result in a reduction in her value as a brood mare. He said if the injury healed as he expected it to, it would not diminish her value but that he did not know whether the injury did heal and never examined the horse again. In effect his testimony was that if the injury properly healed it would not in his opinion cause any impairment in the mare's breeding ability. He testified he would have expected the mare to have aborted within the first week following the injury if she were going to abort, barring some complications that he did not foresee.

After the testimony of the two doctors, Mook was asked, as a professional horseman, whether the fact that the fetus was growing smaller some two months after his first examination of Meadow meant anything to him with reference to the life of the fetus. To this question an objection was urged that the matter required expert medical testimony and that the witness was not shown to be competent to testify on that point. The objection was overruled and Mook was permitted to testify that it appeared to him at the time that the mare was absorbing her foal. He explained that the mare had a late breeding date, that she was not far along in her pregnancy and that the drugs which they were required to give her to keep down pain and infection tended to retard the growth of the unborn foal. Mook testified, without further objection, that in his opinion as a professional horseman she had in reasonable medical probability absorbed, rather than sloughed, her foal because of the apparent manner in which it grew smaller over the two months' period, and that the loss of the foal was caused by the injury received during transit.

Whether Meadow lost her foal through the process of absorption or through

sloughing was not a vital question in the case. The question was whether there was a causal connection between the trauma suffered by the mare during transit and the loss of her foal. Mook was unquestionably an experienced horse trainer, having received his first trainer's license at 16 and holding licenses in fourteen states. He had served as manager of an experimental veterinary clinic with the University of Pennsylvania for nine months and in high school had handled brood mares, breed stallions and had delivered a mare. He testified he was 12 or 13 when he palpated his first mare. He held a GED equivalent to high school and two years of college, and he had been a trainer of thoroughbred race horses for 21 years. He had extensive experience in working with veterinarians in the care and training of horses and in prescribing for them.

■ In our opinion the evidence established the competency of the witness Mook to testify as to what he observed with respect to the condition of Meadow during the palpation process and qualified him to state his opinion as to the probable effect of the injury upon the mare's pregnancy. Nash and Windfohr Oil Corp. v. Johnson, 81 S.W.2d 749 (Tex.Civ.App.— Ft. Worth, writ dism'd); Nations v. Love, 26 S.W. 232 (Tex.Civ.App.1894, no writ); O'Brien v. Von Lienen, 149 S.W. 723 (Tex.Civ.App.—Amarillo 1912, no writ). Mook's testimony was for the most part cumulative of the testimony of Dr. Kelly. While Mook's testimony with respect to the effect of the drugs on the unborn foal may have been improperly admitted, we cannot say that its admission was calculated to cause and probably did cause an improper judgment. Rule 434, Texas Rules of Civil Procedure. The trial court has considerable latitude in the admission or exclusion of such testimony and we cannot say that this discretion has been abused. Appellant's seventh point of error is overruled.

Nationwide's points eight through thirteen relate to the damage issues, asserting that the trial court erred in submitting special issues 6(a) and 6(b) and in entering judgment on such issues, urging that the jury's findings with respect to such issues are without support in the evidence and are against the great weight and preponderance of the evidence. These points, and their related assignments of error in Nationwide's amended motion for new trial, must also be considered as questioning only the legal sufficiency of the evidence.

■ Nationwide first contends there is no competent evidence supporting the jury's award of the sum of $10,000.00 for the loss of the foal which Meadow was carrying at the time in question. It has generally been held in this and other states that damages for the value of unborn livestock are not recoverable, the courts holding that the unborn animal has no value apart from that of its mother. 79 A.L.R. 2d 677, 723 (Sec. 11); Baker v. Mims, 14 Tex.Civ.App. 413, 37 S.W. 190 (1896, no writ); Tex. & P. Ry. Co. v. Randle, 18 Tex. Civ.App. 348, 44 S.W. 603 (1898, no writ). Johnston argues that the view expressed by these cases has been relaxed, pointing out that the Texas Supreme Court has permitted a recovery of damages for a prenatal injury to a child. Leal v. Pitt Sand & Gravel, Inc., 419 S.W.2d 820 (Tex.1967). While there are obviously other distinctions which can be made, we note that in such a case it is apparently an essential element of the cause of action that the child be viable at the time of injury (i. e., have reached a stage of development that it can live outside the uterus) and that it be born alive and survive. Yandell v. Delgado, 468 S.W.2d 475 [Tex.Civ.App.—Ft. Worth, aff'd 471 S.W.2d 569, 570 (Tex.1971)]; Shousha v. Matthews Driv-Ur-Self Service, Inc., 210 Tenn. 384, 358 S.W.2d 471 (1962). We sustain Nationwide's eighth point and hold that Johnston failed to establish a cause of action which would sup-

port the award of damages for the loss of Meadow's foal.

■ Nationwide next contends that there is no evidence supporting the jury's award for damages in the amount of $22,500.00 for Meadow's diminished ability to produce sound, healthy foals and no proof of any causal relation between Meadow's injuries and such diminished ability. Mook testified that Meadow was worth two or three times the amount $9,100.00 of the successful bid price at the auction sale, and by deposition given prior to the time Meadow ultimately produced a healthy foal, testified that she had no value whatsoever; that if a mare could not produce at least a foal every three years·she was worthless. Both Mook and Dr. Kelly testified that an injury of the nature as the one sustained by Meadow would have shortened the mare's life expectancy and Dr. Kelly's testimony indicated he believed the loss of Meadow's second foal was possibly due to the injury sustained. Despite the fact that Meadow subsequently produced a normal foal and the testimony of Dr. Cooley indicating his opinion but barring complication Meadow's value as a brood mare would not be reduced, we are of the opinion that there was some evidence of probative force in support of the jury's finding to special issue 6(b). Nationwide made no objection to the court's charge that the measure of damages was improperly stated. Employment Advisors, Inc. v. Sparks, 368 S.W.2d 199 (Tex.1963). We overrule appellant's points eleven, twelve and thirteen.

■ We sustain Nationwide's fourteenth point complaining that the jury's award of $22,500.00 in response to special issue 6(b) is excessive. Considering the evidence that Meadow subsequently produced a foal which survived and was alive at time of trial, we find the jury's award excessive in the amount of $4,500.00 and suggest remittitur in that sum.

In one cross-point Johnston asserts error of the trial court in refusing to enter judgment on the jury's finding in response to special issue number seven that the reasonable value of legal services rendered to the plaintiff in connection with the suit was the sum of $16,450.00. Johnston asserts right of recovery under Article 2226, Vernon's Tex.Rev.Civ.Stat.Ann., which provides as follows:

"Any person, corporation, partnership, or other legal entity having a valid claim against a person or corporation for services rendered, labor done, material furnished, overcharges on freight or express, lost or damaged freight or express, or stock killed or injured or suits founded upon a sworn account or accounts, may present the same to such persons or corporation or to any duly authorized agent thereof; and if, at the expiration of 30 days thereafter, the claim has not been paid or satisfied, and he should finally obtain judgment for any amount thereof as presented for payment to such persons or corporation, he may, if represented by an attorney, also recover, in addition to his claim and costs, a reasonable amount as attorney's fees. The amount prescribed in the current State Bar Minimum Fee Schedule·shall be prima facie evidence of reasonable attorney's fees. The court, in nonjury cases, may take judicial knowledge of such schedule and of the contents of the case file in determining the amount of attorney's fees without the necessity of hearing further evidence."

■ Johnston recognizes that attorney's fees under Article 2226, Tex.Rev. Civ.Stat.Ann., are not recoverable as a claim for freight damage against an interstate carrier, Southwestern Motor Transport Co. v. Valley Weathermakers, Inc., 427 S.W.2d 597 (Tex.1968), but contends that his claim is asserted as a common law suit for damages and is not based upon a bill of lading contract with the interstate carrier. We are of the opinion that Johnston's claim must be considered "as involving a claim for damages to freight arising under federal law" and that the circumstances of the interstate shipment and the uniformity of treatment of freight damage

claims are the controlling factors in the case. Southwestern Motor Transport Co. v. Valley Weathermakers, supra, pp. 604–5. Johnston's cross-point for attorney's fees is denied.

We hold that the trial court erred in entering judgment for Johnston for the amount of $10,000.00, as damages for the loss of Meadow's foal and that the jury's award of $22,500.00 as damages for Meadow's diminished ability to produce sound and healthy foals ' is excessive in the amount of $4,500.00. We, therefore, reverse and remand the trial court's judgment; provided, that if appellee shall remit said aggregate sum of $14,500.00 within ten days from the date hereof, the trial court's judgment will be reformed so as to provide that appellee shall be awarded the sum of $18,274.00 and in the event such remittitur is timely filed, the judgment of the trial court will be affirmed. Rule 440, Texas Rules of Civil Procedure. If such remittitur is not filed within said period of time, the cause is ordered reversed and remanded for a new trial.

### ON FILING OF REMITTITUR

In our opinion filed December 26, 1974, we ordered the judgment of the trial court reversed and remanded provided that if the appellee would file remittitur in the aggregate sum of $14,500.00 within ten days from said date, the trial court's judgment was ordered reformed so as to provide that the appellee should be awarded the sum of $18,274.00, and as so reformed the judgment of the trial court would be affirmed. Appellee has filed the suggested remittitur of $14,500.00 within the time provided.

It is accordingly ordered that the judgment of the trial court is reformed so as to deduct said sum of $14,500.00 from the aggregate amount awarded to appellee in said judgment and so that the total amount awarded to appellee under said judgment, as reformed, is the sum of $18,274.00 and, as so reformed, the judgment of the trial court is affirmed.